419 So.2d 1237 (1982)
STATE of Louisiana
v.
Elbert A. COBB.
No. 81-KA-2840.
Supreme Court of Louisiana.
September 8, 1982.
*1239 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., William C. Credo, William Hall, Asst. Dist. Attys., for plaintiff-appellee.
James E. Shields, New Orleans, for defendant-appellant.
PHILIP C. CIACCIO, Justice Pro Tem.[*]
Defendant, Elbert A. Cobb, was charged with being a convicted felon in possession of a firearm. R.S. 14:95.1. He was found guilty after a non-jury trial and sentenced to three years at hard labor.[1]
On the evening of July 28, 1979, the defendant, Elbert Cobb, and a friend, Elvin Refuge, were proceeding by car on Hancock Street in Gretna. The vehicle in which the pair were driving was stopped by the Gretna Police and Elbert Cobb was arrested as a felon in possession of a firearm. The events immediately preceding the arrest are in dispute.
The defendant states that he and his companion were driving from the Algiers Project down Hancock Street, in Gretna, when he noticed Officer Panuski's patrol car parked by the roadside. The defendant testified that as he passed the patrol car he noticed that it began to follow him for a couple of blocks. The patrolman then blinked his warning lights and motioned the defendant to the side of the road. Cobb testified that the officer told him to get out of his car and allegedly asked the defendant: "Nigger, who has been shooting the police in Algiers?" The defendant testified that he told the officer that he did not know anything about a shooting as he worked every day. He stated that he then informed the policeman that his wife's gun was in the car. The officer searched the car without defendant's permission and found the gun in the console between the two front seats. This incident occurred about 7:00-7:30 P. M. According to defendant he was arrested, badly beaten and then taken to the police station to be booked. He stated that he was never asked for his driver's license, which was in his *1240 wallet and he was never issued a traffic citation.
Officer Panuski testified to a different version of the arrest of the defendant. He stated that on July 28, 1979 at approximately 9:30 P. M. he was parked by the side of the road on Hancock Street. As he was seated writing his trip sheet he noticed a blue Oldsmobile which was weaving in traffic. He stated that as he followed the defendant's vehicle he noticed two males in the front seat. He signaled the driver of the vehicle to pull over to the side of the road and told the occupants to walk to the rear of their car. When the officer asked for defendant's driver's license, defendant claimed he had to return to the car for it. Defendant sat sideways in the driver's seat while he searched under the seat. (The passenger was at the rear of the stopped vehicle at this time.) As he continued to look for the license the officer stood outside of the car beside the open door. When defendant slid open the door to the console between the bucket seats, Officer Panuski noticed the handle of a gun protruding from beneath a piece of paper in the compartment. Officer Panuski testified that the inside of the car was well lit from the street light such that he could see the defendant reach toward the gun. At that moment Officer Panuski drew his revolver and ordered defendant to freeze. Mr. Cobb continued moving toward the gun so Panuski pulled him from the vehicle. But Cobb pushed Panuski who began falling backward but was able to reholster his gun. Lieutenant Lawson arrived on the scene at that time[2] and assisted Officer Panuski in subduing defendant Cobb. (R., pp. 91-130).
While Officer Panuski was placing handcuffs on defendant the passenger from the blue Cutlass started around the car to help Mr. Cobb, but Lt. Lawson intercepted him and a struggle ensued until Officer Panuski was able to help subdue and handcuff the passenger. Two additional police units arrived on the scene to aid the two officers making a total of four units, (R., p. 120), although Officer Lawson could not recall any additional units arriving on the scene. (Tr., p. 143).
According to Officer Panuski, both subjects were handcuffed and placed in the back of Lawson's vehicle after which he radioed for help and for a records check. At this time Panuski found that defendant was also a convicted felon, so he confiscated defendant's gun and had the car towed to the police station. (R., pp. 91-100).
Officer Lawson's version differs somewhat from that of his fellow officer. Officer Lawson testified that the weapon was taken out of the vehicle after the subjects had been subdued and that Officer Panuski tried to unload the gun on the hood of the car.
Assignment of Error No. 1.
The defendant, by this assignment of error, contends that the trial court erred, when it denied the defendant's application for a subpoena duces tecum. The court gave no reason for denying the application, which sought to secure copies of the radio communications of the Gretna and Jefferson Parish Police Departments on the night of the defendant's arrest. The subpoena states that by production of this information, the defendant "intends to prove that he is not the same person described in the radio broadcast nor is the automobile which he was operating, the automobile which was described in said broadcast." The defendant further intended to prove that "the transmission/recordings incidental to his arrest contain information that is favorable to defendant and necessary for his defense."
Provided a reasonable description of the items is presented, a subpoena may issue which will order a person to produce papers, documents on tangible things for trial. C.Cr.P.Art. 732. The court shall vacate or modify the subpoena if it determines that the subpoena is unreasonable or oppressive. C.Cr.P.Art. 732. If the materials sought are not discoverable, the subpoena may be *1241 vacated. State v. Tauzier, 397 So.2d 494 (La., 1981).
The due process clause of the Fourteenth Amendment of the United States Constitution requires the disclosure, upon request, of evidence which is favorable to the accused, where the evidence is material to guilt or to punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness, where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. U. S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Although there is no duty to provide defense counsel with unlimited discovery of the prosecutor's case, if the subject matter of a request for evidence is material or if a substantial basis for claiming materiality exists, the prosecutor who receives a specific and relevant request must respond by either furnishing the information to the defense counsel or by submitting it to the judge for an in camera inspection. U.S.C.A. Const. Amends. 5, 14. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
Except as specifically provided by statute, a defendant in Louisiana, is not entitled to the discovery of reports, memorandums, or other internal state documents, made by the district attorney or by agents of the state in connection with the investigation or prosecution of the case, nor is he entitled to witness statements made to the district attorney or the state agent. C.Cr.P. Art. 723. However, the defendant is entitled to inspect and copy tangible items, including documents, books and papers which are within the state's control and which are favorable to the defendant. C.Cr.P.Art. 718. State v. Landry, 381 So.2d 462 (La., 1980). The court may conduct an in camera inspection to determine the nature of the requested materials. C.Cr.P. Art. 718. State v. Sylvester, 388 So.2d 1155 (La., 1980). The defendant will be denied an in camera inspection by the trial court where the state has denied possession of the specific information requested and the defendant has made no contrary showing. State v. Davenport, 399 So.2d 201 (La., 1981).
In this case there is no evidence in the record that the state had denied possession of the copies of the police radio communications. Moreover, this information is not exempt from discovery under Criminal Code Article 723, because it does not constitute work product which was gathered pursuant to an investigation of a particular case by a particular agent of the state. A specific request was made and the materiality and relevancy of the evidence was established by the defendant.[3] The defendant *1242 claims the radio communications would verify his version of the arrest and help establish his innocence. This information is crucial, as the defendant's story differs substantially from that of the police officers with regard to the time and mode of arrest, and the events preceding the search and seizure.
The defendant is entitled to exculpatory evidence which is material to the issue of his guilt. He is also entitled to evidence which would impeach the testimony of the police officers as their reliability as witnesses may be determinative of the guilt or innocence of the accused. Since this evidence is discoverable, material, relevant, and specifically requested, the trial court erred in summarily denying the defendant's application for the subpoena duces tecum. We, therefore, conclude that in this case the trial court should have conducted an in camera inspection of the police radio communications for Brady and Giglio information.
Accordingly, we will remand the case to the trial court for its determination of: (1) whether the police radio communications contain information which is inconsistent with the testimony of Officers Panuski and Lawson or other evidence favorable to the accused; and, if so, (2) whether such evidence is material to the defendant's guilt or punishment, employing the standard applicable on the basis of the totality of the facts and circumstances of this case, as stated in State v. Sylvester, 388 So.2d 1155 (La., 1980).
In the event of an affirmative determination of both of these factors by the trial court, a new trial will be required. However, upon a contrary finding, the conviction will be affirmed. For purposes of future appeals the transcript of the police communications should be sealed and made a part of the record. The proceedings and determination of the trial court, of course, will be subject to review on appeal.
Assignment of Error No. 2.
The defendant argues that the trial court erred in denying its motion to suppress the evidence.
Unreasonable searches and seizures are prohibited by the United States and Louisiana Constitutions. U.S.C.A. Const. Amend. 4; La. Const. Article 1, Section 5. Unless the search can be justified by one of the narrowly drawn exceptions to the warrant requirement, a warrantless search is unreasonable. Schenckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). There exist various exceptions to the general rule that a warrantless search is illegal. State v. Jewell, 338 So.2d 633 (La., 1976). Under one exception, officers may conduct a limited search for weapons during a lawful investigatory stop, where such a search is necessary to neutralize the threat of physical harm. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The police officer is not required to stand by and give the suspect the first move before taking action. See: State v. Wade, 390 So.2d 1309 (La., 1980). Accordingly an officer has a right to take a weapon into custody for his own protection. State v. Reed, 388 So.2d 776 (La., 1980).
The state bears the burden of proving the validity of a warrantless search and thereby furnishing a basis for the admissibility of the evidence. State v. Bible, 389 So.2d 42 (La., 1980).
In this case, two different stories were given concerning the events preceding the search and seizure of the weapon. The trial judge chose to accept the police officer's version of the events that transpired prior to the seizure of the gun.
*1243 According to Officer Panuski, the defendant and his guest passenger were stopped for a routine traffic violation, namely, weaving in traffic. The defendant and his companion were ordered out of the car. The defendant returned to the front of the car to search for his driver's license. The defendant was seated with the driver's door open. Officer Panuski was standing by the open door next to the defendant. The handle of a gun was visible as the defendant opened the console located between the two front seats. The gun became fully visible as certain papers which were partially covering it were removed by the defendant. The officer ordered the defendant to freeze as he reached for the gun. The officer had his service revolver pulled and pointed toward the defendant. Panuski testified that he struggled with defendant outside the car in the process of arresting him. The defendant was then subdued and handcuffed. The officer contacted his police station for a check of the defendant's criminal record. The officer was alerted that the defendant was a convicted felon. The defendant was arrested for being a felon in possession of a firearm.
Although the firearm was seized pursuant to a warrantless search, the search was legal under the guidelines set forth by the United States Supreme court in Terry v. Ohio, supra, and State v. Reed, supra. The officer, during a lawful investigatory stop took temporary custody of a weapon, for his own personal protection. He had reason to fear for his life, due to the defendant's action in moving his hand towards the weapon. This set of circumstances warranted the seizure of the gun. Once the computer check of the defendant disclosed the fact that he was a convicted felon, the officer was justified in retaining the item for evidentiary purposes.
The seizure of the weapon from the defendant's vehicle was not a violation of the defendant's constitutional rights and the motion to suppress the evidence was properly denied.
Assignment of Error No. 3.
The defendant contends that the verdict is contrary to the law and the evidence, in that the state failed to establish that the defendant was a convicted felon and that ten years had not elapsed since the completion of his sentence and that he had the requisite intent to commit a crime.
In Jackson v. Virginia, the United States Supreme Court held that in order for a conviction to be upheld the evidence when viewed in a light which is most favorable to the prosecution, must convince a reasonable trier of fact that the defendant is guilty of every element of the crime beyond a reasonable doubt. 99 S.Ct. 2781, 443 U.S. 307, 61 L.Ed.2d 560 (1979).
The defendant, Elbert Cobb, was charged with being a convicted felon in possession of a firearm. R.S. 14:95.1. Therefore, the essential elements of proof are: (1) The defendant was previously convicted of a felony; (2) ten years had not elapsed since the completion of that sentence; and, (3) the defendant had the requisite general criminal intent to commit the crime.
In proving that the defendant was a convicted felon and that ten years had not elapsed since the completion of his sentence, the state offered six documentary exhibits into evidence, which dealt with the charge, conviction and commitment of the defendant on a prior felony charge.[4]
The defendant did not object to the admissibility of the documents on the basis that they were hearsay, however, he strenuously objected to the admissibility, because the documents lacked authenticity.
The trial judge has great discretion in determining the sufficiency of the foundation which is necessary for the introduction of evidence. State v. Peters, 302 So.2d 888 (La.1974). The rule of authentication, evidencing the genuineness of a particular *1244 document, must always be satisfied. State v. Martin, 356 So.2d 1370 (La., 1978), app. aft. remand, 372 So.2d 563. A copy of a document certified by the officer who is the legal custodian, is equivalent to the original for purposes of authenticity, provided the certificate of the officer concerns a matter which is under his general vested powers. R.S. 15:457. The authority to testify to the authenticity of an original document or to certify the authenticity of a copy is a duty which may be delegated, provided it clearly appears in the evidence that the person authenticating the original by custody or certifying the copy has been entrusted with legal custody of the original document by the original official custodian. State v. Tillman, 356 So.2d 1376 (La., 1978). That is, the witness introducing the document into evidence must testify from personal knowledge regarding its official custody, specifying from whom or from which office he received the document. State v. Nicholas, 359 So.2d 965 (La., 1978).
Except for the defendant's court record, the documents introduced in this case were made by the Jefferson Parish Sheriff's Office or constituted correspondence sent to that office. Each item, namely State Exhibits 1, 2, 4 and 5 bear the following inscription "A true copy of the original on file in this office" and each was signed "Johnnie Koppel, Deputy Sheriff, Parish of Jefferson, La., March 10, 1980." The State Exhibit 6 was an original fingerprint card, under the original signature of Johnnie Koppel and dated March 10, 1979. The in globo exhibit, State Exhibit 7, consisted of the defendant's prior court record of the felony offense and each item in the offering was stamped and was under seal. The inscription reads "A true copy of the original on file in this office", and was signed "Debra Schnexnayder, Deputy Clerk, 24th Judicial District Court, Parish of Jefferson, La."
At the trial of this matter, Officer Johnnie Koppel testified that he was an employee of the Jefferson Parish Sheriff's Department and that he was an expert in fingerprint analysis. He testified further that the exhibits in question were certified copies of the original documents which were under his control at the Sheriff's Office.
It is apparent from the testimony of this witness that he had been delegated the duty of testifying to the authenticity of the documents and certifying the authenticity of the copy. Moreover, it is evident from the record, that Officer Koppel had been entrusted with legal custody of the original documents by the Sheriff's Department. It is our conclusion that since the documents were certified copies and since this witness was the properly delegated officer to present these items, that State Exhibits 1, 2, 4 and 5 were properly authenticated.
The fingerprint card, labeled State Exhibit 6, was made by means of the defendant being fingerprinted in open court.
The expert witness in fingerprint analysis testified that in his opinion the fingerprints produced in open court were the same as those on file for the defendant, Elbert Cobb. Therefore, State Exhibit 6 needed no further qualification as it came into existence under the direct observation of the Court.
The trial court, in considering State Exhibit 7, took into account the fact that these items were certified copies of official court records and admitted the copies into evidence as properly authenticated.
In the case of State v. Rowell, this Court held that any record on file with the Clerk of Court, which was otherwise admissible in a judicial proceeding, can be introduced in the original form or by a certified copy and it is not necessary for the Clerk or Deputy Clerk of Court to personally appear and testify to their authenticity. R.S. 15:459. 306 So.2d 668 (La., 1975). These items were properly authenticated for purposes of admissibility.
The final issue to be considered, with regard to this assignment of error, is the defendant's contention that he did not possess the requisite intent to commit this crime. Our review of the record convinces us to the contrary. The defendant, by his own testimony, admitted under oath that he *1245 advised the arresting officer that his wife's gun was in the car. The defendant's admission satisfies the element of general intent. The defendant's testimony and the State's supporting exhibits satisfy the elements of the crime.
When considering the evidence in a light most favorable to the prosecution, this Court is satisfied that the State has proven every element of this crime beyond a reasonable doubt.
Assignment of Error Number 3 lacks merit.
Assignment of Error No. 4.
In this assignment of error, the defendant contends that the trial court erred when it denied the defendant's motion for a new trial. The defendant alleges that a new trial should have been granted because there was newly discovered evidence in the possession of the Gretna Police Department and the F.B.I. which would impeach the testimony of Officer Panuski and which would support brutality charges and charges of civil rights violations.
The motion for a new trial rests upon the supposition that some injustice has been done, therefore it is incumbent upon the mover to show that this is the case. C.Cr.P.Art. 851. See: State v. Coleman, 390 So.2d 865 (La., 1980). The trial court is granted much discretion in evaluating the impact of newly discovered evidence and its ruling will not be disturbed, absent a clear abuse of discretion. State v. Spell, 399 So.2d 551 (La., 1981). In considering a motion for a new trial based upon newly discovered evidence, the test to be employed by the trial court is whether the newly discovered evidence is so material as to warrant a different result than that which was reached in the original proceeding. State v. Miles, 402 So.2d 644 (La., 1981); State v. Motton, 395 So.2d 1337 (La., 1981).
In this case, the defendant has not recited the nature of the new evidence which he contends is so material as to change the verdict against him. He has failed to meet his burden of proving that an injustice has been done. Moreover, he has failed to prove how the trial court has abused its discretion in denying the motion for a new trial. This assignment of error has no merit.
Assignment of Error No. 5.
The defendant argues, in this assignment of error, that his sentence was excessive and that it was imposed due to retaliation because the defendant had filed a Federal Civil Rights Act suit.
A defendant convicted of being a felon in possession of a firearm shall be sentenced to serve "not less than three nor more than ten years without benefit of probation, parole or suspension of sentence." R.S. 14:95.1. The only exceptions to the statute exist when the defendant has not been convicted of a felony for ten years from the date of the completion of his sentence, probation, parole or suspension of sentence and in those instances in which the defendant has been issued a permit to carry a firearm. R.S. 14:95.1. The statute, under which the defendant was prosecuted, imposes upon the trial judge a legal obligation to imprison the defendant.
In this case, the trial judge initially granted the defendant a suspended sentence. However, this sentence was vacated and a three year prison term was imposed after the State filed a motion to correct an illegal sentence.
An illegal sentence may be corrected at any time. C.Cr.P. Art. 882. State v. Siegel, 354 So.2d 525 (La., 1978), app. aft. remand 376 So.2d 492.
In imposing the new sentence, the trial judge stated that he was acting in this manner because he was obligated by law to impose a prison term. He stated that the reason he had suspended the sentence was because he felt that the defendant would have responded affirmatively to this action since the defendant had passed seven years without incident since his prior felony conviction and the defendant's actions were motivated from fear and a concern for his family's safety.
*1246 The imposition of the statutory minimum sentence and the explanation of the trial judge at the time of sentencing clearly indicate that the sentence was not excessive, nor was it motivated from revenge. This assignment lacks merit.
For the reasons assigned, defendant's conviction and sentence are affirmed, but the case is remanded for further proceedings in accordance with the views expressed herein, reserving unto the trial court the authority to grant a new trial on the basis of his findings, and also reserving the defendant's right to appeal from any adverse ruling by the trial court.
AFFIRMED CONDITIONALLY AND REMANDED.
NOTES
[*] Judge Philip C. Ciaccio and Judge Israel M. Augustine, Jr. of the Court of Appeal, Fourth Circuit, and Judge H. Charles Gaudin of the Court of Appeal, Fifth Circuit, participated in this decision as Associate Justices Ad Hoc joined by Justices Calogero, Dennis, Watson and Lemmon.
[1] The trial court originally suspended the defendant's sentence, however, pursuant to the State's motion to correct an illegal sentence it resentenced the defendant to prison.
[2] Lt. Lawson testified that as he exited the bar after a vice check, he saw Officer Panuski out of his police vehicle with a stopped motorist. When he saw a struggle ensue he went to Panuski's assistance. (R., pp. 131-132).
[3] The defendant claims the following vital information could be proved with the police communications records:

A. There were at least five Gretna police vehicles and Jefferson Parish Sheriff's Department vehicles, at the scene of stop and arrest; that City of Gretna officials also were at, or arrived on the scene, which is contrary to the testimony of Officers Panuski and Lawson.
B. There were numerous communications, by radio, before the stop of the Cobb vehicle, pertaining to a shooting in Algiers which is also contrary to the testimony of Officer Panuski.
C. The tapes will show that after the arrest at the scene, various radio communications were made to various personnel of the City of Gretna police authority, to meet Officers Panuski and Lawson at the Gretna Police Station, and will or would have shown what police officer or official "signed off the radio frequency, at the Gretna office.
D. Said transmissions would and/or will show that, by radio message, Officer Panuski stopped Cobb's vehicle between 6:15 P. M. and 7:00 P. M. which is more than 2½ hours prior to the time that Officer Panuski testified that the stop and arrest was made.
E. The tapes will and/or would have shown, conclusively, that Officer Panuski never made a call by radio, at the scene of arrest, to NCIC in regard to Appellant's prior criminal record. If he had made the call, then a radio call back to Panuski, at the scene would have been made. If these two calls were not made, then Officer Panuski has not been truthful and he had no basis for Appellant's arrest, as he testified.
F. The radio tapes would have or will explain why the arrest register, from the Jefferson Parish Sheriff's Department, shows that appellant, Elbert A. Cobb, was booked at 6:32 P. M., more than three (3) hours prior to the time that the police had testified that the stop and arrest was made. The time in booking is shown in the following:
Assistant D. A. Hall: At this time, I am showing him the arrest register from Jefferson Parish Sheriff's Office on Cobb."
Q. What time does it say, Officer?
A. This here, time of booking, 6:32 P.M. Evidently, it is a mistake in the computer."
(Tr. p. 27)
G. The radio tapes might explain the mystery of how, when and where Appellant's leg was broken and his ribs cracked and how the passenger received 28 stitches in his head, as to who made the radio call for a medical unit and at what time and from where said call was made.
[4] The state successfully offered the following exhibits into evidence: S-I and S-2: Fingerprint cards. S-4: An arrest sheet. S-5: A letter from the Department of Probation. S-6: Fingerprints of the defendant made in open court. S-7: Court record in State v. Elbert Cobb, # 73-161. The court refused to admit into evidence S-3: Rap Sheet.